Thank you, Your Honor. My name is Alan Copsey. I'm an Assistant Attorney General with the State of Washington, representing the State Defendant Appellants in this matter. We would like to reserve five minutes for rebuttal, and we'd like to split our time and our opening approximately equally between me and Ms. O'Leary. Well, now, you have to keep track of your time, and so you are reserving how much for rebuttal? Five minutes, please. Okay, so then you keep track of your split, because we've had counsel take away their co-counsel's time before. I understand that. All right. Thank you. And when she says you have to keep track of your time, if you really want five minutes, it really means you've only seven and a half, so leave her some time. It's all aspirational. Okay. The district court erred in issuing a preliminary injunction. The plaintiffs did not clearly show that they were entitled to an injunction. They did not show either a likelihood of success on the merits or a balance of hardships that tips in their favor. They succeeded because the district court applied an erroneous legal standard to their free exercise claim. I will address the erroneous legal standard used by the district court, and Ms. O'Leary will address the balance of hardships. When evaluated under the U.S. Supreme Court cases Smith and Licumi, the challenged rules are neutral and generally applicable regulations that do not offend the free exercise clause. They are designed to ensure patients' timely access to medicine. They do not focus on any specific medicine. They do not require any pharmacist to dispense any particular medicine. They are absolutely neutral toward religion, and they apply to all pharmacies and all pharmacists licensed in Washington. Well, it's hard not to recognize the context that we're not talking about just any drug on the shelf, are we? We are talking about any drug on the shelf, Your Honor. Well, you know, I've been in Seattle now for two days on this trip, and I've already seen two newspaper articles and a radio report about today's proceeding, and somehow every one of them referred to Plan B and not to some other drug on the shelf. And the context of how this came about seemed pretty clearly to have risen because of concerns that Plan B wasn't available or might not be available to the person seeking that particular prescription, or now non-prescription. So you can say that the regulation is meant to apply to everything, but the context of its adoption makes pretty clear what it was meant to apply to, doesn't it? No, I disagree, Your Honor. It is true that there was a controversy about Plan B, and it's true that the newspapers and the television stations, et cetera, have picked up the Plan B aspect of it. But we don't judge what a rule says and its effect based on what the newspapers say or what the public controversy is. What we have here is a situation where the pharmacy board had people that came to it and said, we have a question for you. The question is, what would happen if a pharmacist refused to dispense a time-sensitive drug, and instead, as had happened in some other states, the pharmacist perhaps ripped it up or otherwise refused to return it to the patient? Well, let's get to the real legal issue here, which is that the district court took into consideration the legislative history and the background that Justice Kennedy relied upon in his lacuna majority opinion, but as to which only himself and one other justice subscribed. And then we have a Ninth Circuit case in a footnote where we adopt that kind of analysis, the Morgan Hill case, and we say, yes, that we should, in addition to the text and the operation, we can consider the equal protection kind of analysis. I guess that's the San Jose Christian versus Morgan Hill. So in analyzing whether the district court applied the wrong standard of law here by taking into account the legislative history that was before him, is it, you know, as a matter of law, given where we stand after Smith and Lacuma, was that an error or was that perfectly appropriate? No, it was an error, and there's two responses, I would say. One with respect to the San Jose Christian College case, which I believe is the one you're talking about. That footnote was not ñ I don't think it's fair to characterize it as an adoption by the court of an equal protection analysis. If you read the language of the footnote, it says that the court recognizes that the Supreme Court has applied an equal protection analysis, but as we pointed out in our response brief, that recognition was premised on a section of the U.S. Supreme Court's decision in Lacuma that wasn't signed on to by all the justices, and I think the panel missed it. Justice Scalia says we absolutely should not consider that. That's the second part of the answer. If you look at both at the Smith test as it was established and as it was applied in Lacuma, I think the answer to your question becomes quite clear by looking at what the court actually did in Lacuma. It looked first at the text of the ordinances to see whether they mentioned religion, whether there was some reference to religion in the ordinances themselves that might indicate that the ordinances were not neutral. If there was, then it went to the second step, and it found that there was. It went to the second step, which was to look at the operation of the ordinances. Having found in that case that the operation of the ordinances indicated that the ordinances were gerrymandered so that they specifically applied to a particular religious exercise by a particular religious group and to no one else, on that basis and only after that did Justice Kennedy then proceed to look at the events that led to the adoption of the ordinances. Well, what do we know about the actual operation of the ordinance in this case? We decide the actual operation by looking at the language of the ordinance. We haven't seen the ordinance in operation for very long, in part because there's a partial summary preliminary injunction against it. Right. I think it was actually, what, five months after the ordinance went into effect. So does the record reflect any enforcement of the ordinance? We have no enforcement of the ordinance with respect to Plan B because, of course, the injunction is in effect. What we have is a situation. Let me back up a little bit. Prior to the entry of the injunction. Let me back up. The enforcement mechanism that the pharmacy board is charged with is a complaint-driven mechanism, so that if complaints arise, they're passed to the board. The board decides whether or not to investigate them. Oftentimes the complaint is not specific enough to understand what the nature of the complaint is. If it looks on its face to be a violation of one or more of the pharmacy's rules, then an investigation is conducted. To my knowledge, none of those investigations have been conducted to the point where we know that we're talking about something like a free exercise claim. Certainly none has reached the level where the board has taken any action about it. Let me ask you. I know you wanted to give your co-counsel some time here, but I'm looking at a preliminary injunction. We're going to have a trial. We've got a preliminary injunction here. We've got a standard review, which is abuse of discretion, correct? Correct. And so I look at these injunctions. Preliminary. We haven't even got to the real meat of the argument. And now what is the standard review? On one end, one can demonstrate a strong likelihood of success and the possibility of irreparable injury. At the other end of this sliding scale, one can say that the stay applicant demonstrates the balance of hardship tips sharply in its favor, and the applicant must only show that it raises serious legal questions. So if this stay applicant can suggest that the balance tips sharply in its favor, it would only need to show that there were serious legal questions in this particular situation. Isn't that correct? That would be correct, Your Honor. Okay. If this district court imposed a pretty wide injunction, is there any way to narrow the injunction only to the parties applicable and not meet the test that there are sharply balanced hardships in their favor and serious legal questions to be determined? Go ahead. In the first place, we believe that neither prong on that sliding scale has been met on either end. Well, I mean, if I just say that this injunction only applies to three people who bring this case, I'm not talking about the world of Washington, which this all of a sudden became, but the three people who bring this case and what it applies to them and that there are serious legal questions that they raise as to the statute itself, why cannot an injunction, which is not so wide as the one we have here, be applied? Your Honor, a narrow injunction like that would certainly be less objectionable in this context. Well, that's one of the things you asked for, right? We asked for it, and it was denied. The district court denied our request to narrow the injunction. Oh, they asked for a narrow injunction. We asked for a narrower one. They responded by asking for a narrower one. Yes, all parties asked for a narrower injunction in the district court. So one could send this back to the district court and say, hey, you got carried away with the scope of this injunction, fashion it to the parties who are here, give them the test. Well, Your Honor, it's an abuse of discretion if the district court applies the wrong legal analysis to the underlying legal claim. And as this court has held in the war soldier case, if it's an abuse of discretion by the district court, the injunction should not stand. And where the district court made its error was in not properly applying the test established in Smith and Licumi. But I have the opportunity here not to just say your injunction is good or your injunction is bad, but to say, go back, think about this. What do we have in front of us? Three parties who have alleged problem. What can you do to solve the problem for these parties and make sure they're not hurt in this process? Because after all, this is a preliminary injunction. And let the court go on and decide its constitutional duty under 1983, given the trial, and just keep the parties in the present position. You don't have to go all over the state of Washington with such an injunction. I agree with what you're saying, Your Honor, except that there is no injunction that the plaintiffs are entitled to if the improper legal standard is used to assess the First Amendment claim. Just a minute. The standard is not that. The standard is that they raise serious legal questions. Serious legal questions. What does that mean? What case do you have that tells me what that means? I have no case that tells you what that means. I don't either. I would argue that it means at least a colorable question. I would also argue that in order to assess whether there are serious questions on the merits, you have to use the proper legal standard to make that assessment. And in this case, the district court did not even use the proper legal standard to assess whether those claims are, in fact, serious claims. I mean, if I put those who would suggest they were harmed by this particular situation and I narrowed the injunction to only the claimants that are here, those who would say they were harmed would not be harmed at all because they don't even go to those places to do business. They don't have any part of that. So it seems to me the district court has put an all-Washington injunction involved when he very well could have said, hey, I got a case in front of me. And to suggest that what he said about the issue of the context of how this came and how that might relate to the whole of his ability to win or not win, it seems difficult for me to suggest those are not serious legal questions. Insofar as the plaintiffs brought a constitutional claim, you could say that any time a plaintiff brings a constitutional claim, they've raised a serious legal question. The Constitution is a serious legal matter. But if they raise a claim where they, first of all, are misconstruing the rule that's being challenged, they're misreading the rule that's being challenged, the rule does not say what they have argued to the court that it does say, the district court, instead of looking at the appropriate legal test, instead focuses on the controversy, focuses on what all the comments are saying, not on what the pharmacy board did through the rule adoption process. Well, but the 1983 case has two prongs. And I appreciate where the district court has gone. One of the prongs is that there's some kind of a constitutional violation, and that seems to be the only place we've focused. But this trial is not going to be about that. The second prong is how much knowledge or how much ability is there for those who have done it to really have done it at all. Now, all I'm suggesting is we have serious legal questions that they are bringing against what happened here, and I'm trying to get you to respond to that. And if I fashion the injunction such that it doesn't take on the whole state of Washington, then I have a way to have an injunction which might be appropriate. And all I'm suggesting that, because, you know, I was a district judge in Idaho. Everybody who didn't like term limits got on board. Every commissioner, every school board, everybody was there. So I couldn't fashion a narrow injunction. We have one we can fashion here. The question, though, is there's a prior question to the breadth of the injunction, and this is how I'm trying to respond to your question. The prior question is whether an injunction is even warranted. And the fact that they have raised a constitutional claim does not mean that it doesn't Speak to preliminary injunction. I mean, I think the question Judge Smith is posing is that there's going to be a trial. There's going to be a resolution, a time for that. We're dealing here with a preliminary injunction. I suspect if the injunction had been limited to the immediate parties in the case, we might not be here today dealing with a lot of public attention about one pharmacy and two pharmacists. And, indeed, you might not even have bothered to challenge a preliminary injunction because you would have liked to have gotten to the main event. Here we are in a preliminary injunction stage where we have to anticipate what's going to happen. We've got a factual record that makes it very difficult to deal with it. We have on one side claims of not being able to get access to drugs where there's essentially no demonstration that there's a problem. We have on the other side claims of being driven of losing my livelihood and so forth. There's no record of enforcement by the agency. This is all very hypothetical on both sides. So aren't those questions better addressed in a context where you have a record? And if that's the case, if you can limit the problem in the short term to one pharmacy and two pharmacists as opposed to applying this injunction to the whole state, doesn't that give you a more confined proceeding to deal with? Is there a reason not to do that? What is not hypothetical is the district court's erroneous legal standard. Wait a second. I have a question because I think both Judge Smith and Judge Clifton raised an interesting question. But there is the state of Washington is also a party. So what are its interests? And in analyzing whether or not a preliminary injunction should issue, the public interest is a factor. So what is the public interest? And if we were to go down the road of narrowing the injunction, concluding, and I'm not sure what the support is for this, that just any challenge on a constitutional ground is a serious question, to go down that road, how do you account for the interests of the state of Washington and the public interest? I'd like to give my associate counsel here an opportunity to answer more questions about harm and about public interest. Let me say just in one sentence, the strong public interest here is a public interest in timely access to medicine, for medicines that are time sensitive. They have to be made available in a matter of hours or a day or two in order to be effective. I guess the answer to that is if this injunction is limited, as Judge Smith is suggesting, then that interest of the state in Washington is not affected to the vast remainder of the population in Washington and the vast remainder of pharmacies and pharmacists in the state of Washington. So all of a sudden that interest diminishes tremendously. In this factual context, that issue diminishes. That's why our concern is not with the scope of the preliminary injunction, but with the proper legal standard. Well, the situation is very different. As I understand it, there's something like 20 or 30 other pharmacies in a five-mile radius of the one we're talking about here. You go to eastern Washington in a rural area, you may have the only pharmacy within 20 miles. That's a very viable concern for the state in that context. But that's why we wonder, or I'm wondering in this context, if the current injunction were limited to this one pharmacy, so that access to Plan B or to any drug really isn't an issue because you've got lots of other places to go to in the immediate vicinity, then the problem faced by the state, the public interest here, the concern about the rest of its citizens seems to be much different, much evaded. And that would permit the rollout of this case and the creation of a proper record. It would permit the rollout of this case with the judge having applied an incorrect legal standard and presumably continuing to apply the incorrect legal standard. And that's the harm that has prompted the appeal in this case. I'd like to yield my time. Have they used up 20 minutes? Nineteen. Nineteen. Or we've used it. Or we've used it. Yeah. I'll give you a couple. Give them some of my time. Yeah. I appreciate it. Thank you, Your Honors. May it please the Court. My name is Rima O'Reilly, and I represent the defendant intervenors in this action. And I'd like to dive right into the issue of the balance of hardship, since that seems to be the focus of this Court's concerns. I think what I would agree with Judge Clifton in your observation that the interests on both sides are hypothetical. We don't know what will happen to Ms. Messler, Stormins, or Ms. Thielen if the regulations are allowed to be enforced and if the preliminary injunction is, in fact, lifted. They haven't actually established that they would suffer financial injury. And at the end of the day, it is truly just financial injury. Now, I don't mean to minimize that, since certainly the loss of a job can be serious if that is indeed what happens. But as this Court has previously recognized, financial injury is something that can be ameliorated and compensated for. While, on the other hand, what we have is women who stand and face a risk of an unintended pregnancy if they are unable to access Plan B in a timely fashion. Right. But if we were to do something along the lines of what Judges Smith and Clifton are suggesting, we're talking about an injunction that doesn't affect anybody other than, I think, the seven defendant intervenors in this case who actually got the medicine that they needed. Well, they're not even in Olympia. What I would say is, even if the situation is, if the injunction is limited to Ms. Messler, Ms. Thielen, and Stormins. Now, first of all, we don't know where Ms. Messler and Ms. Thielen actually work. So we don't know if it is on this record. But this is a bare record, isn't it? It is a very bare record. And so we don't know what access to Plan B patients that they serve actually have.  And so those pharmacies are under the obligation of the rules that regulate the pharmacies. So they would have to provide timely medical care to people with lawful FDA drug-approved prescriptions. So you are contemplating narrowing the injunction solely to Stormins? I'm not. I'm just intrigued by my colleagues. The State could be enjoined from proceeding against the individual pharmacists because there is an argument from being offered up that they are at risk because the State can use the discrimination against the sexual discrimination as a device to go after their individual licenses. They could be covered by the injunction, but the injunction would not protect the pharmacies for which they work from refusing to dispense the prescription. I see. Well, what I would go back to is that emergency contraception is a time-sensitive medication. So even if you're in a situation where an individual patient can be refused and then referred elsewhere, the effectiveness of that medication decreases linearly with time. At 20 or 30 pharmacies within five miles. And you can even post a sign outside, we don't have the following, go here. It's really hard to make out a case that says the 15 minutes it's going to take you to get to five other pharmacies is going to be too long. Certainly. That certainly may be the case. One of the things, too, that I definitely question whether the district court erred in considering all this legislative analysis. As Justice Scalia says, it's really hard to discern what a motivation is by considering legislative history. But we do have to consider actual operation. Yes. And what we don't know is post-operation or post-effective date of these regulations, are they targeting religion or are they achieving the goal of timely service of patients' medical needs? Is there something in them that, I mean, how is the enforcement mechanism working? Are people complaining? Let me, you raised two very important points that I think Mr. Copsey didn't have an opportunity to get into. And one is what relevance is the evolution of the rulemaking process? The fact that refusals to dispense Plan B triggered the rulemaking process were the focus of the  All of those facts are legally irrelevant, and here is why. If we go back to Smith, Smith holds that accommodation is not constitutionally required. It is a process that is to be left up, is a decision that is to be left up to the legislature. So when religious minorities have a claim for an accommodation, they go to the legislature, they are opposed in that, and they lose. It simply means that the legislature or the legislative body, here in this case it's the accommodation, nothing more. It is not evidence of religious animus. When you go and you talk about disproportionate effect, is it just religious pharmacies that are being targeted or applied? We, first of all, have no evidence about how this rule is being actually applied. But its operation, which is all that we have, is that it applies even-handedly. It regulates general conduct. And it's a very different situation than what you had in Lukumi, where you had a regulation that was actually gerrymandered in such a way that the only conduct it would apply to is that of the Santerian's worship practices. Whereas here, you have a... But the ordinance in Lukumi didn't say that animal sacrifice or ritual sacrifice by members of the Santeria faith is prohibited. They tried to obscure it, not real successfully, but they tried to obscure it more than that. So at least in Lukumi, the court's looking beyond the text of the ordinance and didn't say, well, there's no mention of religion there, so it's okay. At least to some extent, you've got to dig down underneath to see what's going on. Now, I understand all your arguments that this isn't that case. But in terms of the legal structure, here the district court apparently found this is Lukumi. And I'm not sure that I can understand how you sustain that kind of factual finding. But in terms of a legal approach, isn't it appropriate to say, look, Lukumi says that goes too far, so I can dig into the statute of regulations here, just like the Supreme Court dug into the ordinance in Lukumi. The ordinances in Lukumi, actually, the court noted that their text was not actually facially neutral, that they did refer to use words like ritual and sacrifice that had religious connotations. But hold on. To say that wasn't enough. There's also a nonreligious interpretation for those words, so that wasn't where the court stopped. Right. It went and looked at how do these ordinances operate, and it looked at the exemptions that were set out in the And in that case, it was that, say, take, for example, animal killings for food consumption were exempted. But in the Santiaran religion, if you killed an animal and there are certain rituals in which the animal would then be consumed, well, in that case, they weren't, didn't fall within the exemptions for food consumption. Or, for example, the regulation, the ordinances there allowed animal killings that were done in connection with kosher slaughter. So as long as they were done in connection with the Jewish religious ritual, it was okay under the ordinances. So in that way, the court certainly found, just based on the text and ordinances, that they were not neutral and they were not generally applicable. And again, Justice Kennedy then went beyond and looked at the legislative history, but that was something that was certainly not joined by the court. Who was the other justice that joined it? Stevens. It was Stevens. But the court didn't reject that either. I mean, you had five justices that just didn't speak to that subject, or four that didn't speak to that subject one way or the other. They just didn't go into that subpart. And so I want to pin down what you say, or your colleague, is phrased in terms of a misapplication or misunderstanding of the law. I understand the argument that explored that part of the history. It can be argued, look, Lakoumi, that's not a majority. What other misunderstanding of the law, as opposed to misapplication to the facts, are we talking about here? That we're talking about in this case? In this case. Well, I think there are three specific ways in which the district court erred. First is by looking at the evolution of the rulemaking process, which is not relevant. Second, it looked, it mistakenly seized upon this fact that they might have a disproportionate effect on pharmacists who have religious beliefs that are opposed to Plan B. Now, a disproportionate effect has never been the test for whether or not a neutral and generally applicable law violates the Constitution. And in addition. That's true, although if you accept for a moment that the district court decides this is a Lakoumi case, Lakoumi starts triggering strict scrutiny and compelling state interests and narrowly tailored. And that's not that far away from what he did. I mean, it is certainly true that the district court imposed a harder test than rational basis. But Lakoumi opens the door. If you find this to be a Lakoumi case, then is that a misunderstanding of the law? I think it is a misunderstanding of the law. It's a misapplication of Lakoumi. Lakoumi does not apply to the facts here because you don't. In Lakoumi you had text that was not particularly neutral, that was susceptible of different interpretations, and you had ordinances that were religiously gerrymandered so that they only affected religious conduct. That is not the situation here. Everybody agrees that the text of these regulations is neutral. They are generally applicable in the sense that they apply to all medications, they apply to all pharmacists and pharmacies, and they apply to all personal objections, whether religious or secular. The only way they are. Well, they don't, actually, because the one thing that really bothers me, look at this The pharmacy isn't required to stock any particular drug. So if they decide, I just don't sell enough, and in fact the board's survey suggests that of the pharmacies that didn't carry Plan B, the predominant reason was they didn't have any requests for Plan B, so it wasn't worth it to them. And that excuse is okay. That objection that it might cost me a buck seems to be good enough, but the objection of I'm going to anguish because I think it's murder, that's not good enough. It's hard to say that the board isn't picking and choosing between the objections, if that's the regulation. Certainly a law may have exemptions to it, and that doesn't make it constitutionally suspect under the free exercise clause, so long as those exemptions are consistent with the overarching purpose of the regulations of the law. Here, when you talk about the economic reasons, I'm not sure, maybe the board's survey was not entirely accurate. There is a stocking regulation in place. And what that regulation requires is that pharmacies serve the pharmaceutical needs of their community, and they must stock those drugs that their community demands. So it's not like a pharmacy who is in a college town can simply say, I don't feel like stocking contraception or Plan B, because they are in an area that services women of childbearing age. But the problem is likely to occur here. I mean, we can all put together the scenario. You've got a town in eastern Washington where there's not many people and not many one of the interveners seems to fit this situation and goes to the local pharmacy and that happens in one of those places that says no. Well, given this barren record, I'll speculate to my heart's content. It's not hard to speculate. There probably aren't many requests for Plan B at a pharmacy in rural eastern Washington. And so this stocking regulation you're talking about may not be enough, and certainly nothing that I've seen in the paper submitted so far, which, again, is such a barren record that we're all guessing, suggests that that many decisions not to stock Plan B have to do with religious scruples. So in terms of availability, I can't see that there's going to be a whole lot of impact from this regulation. If the board isn't going to apply the regulation in such a way as to require it to be stocked, it can't speak all that clearly to the availability question. If it's going to accept an economic excuse and not a religious excuse, aren't they picking and choosing? Our argument would be that the economic reasons for not stocking, or the economic reasons that exempt someone from not complying with the regulation or the duty to dispense are consistent with the overarching purpose, which is to promote public health and patient access to medication. You have to recognize the fact that pharmacies are businesses. They can't be required to stock every single drug that's out there. There are tens of thousands of those drugs. And that a community needs standard is actually very flexible and allows them to maintain a reasonable assortment of drugs. All right. Counselor, you've been way over. You're going to have some rebuttal time. Let's hear from the other side. Thank you. Good morning. My name is Kristen Wagner, and I'm counsel for the plaintiffs. I'd like to introduce the court to the plaintiffs sitting behind the counsel table. This is the Stormins family, made up of Ken Stormins and his three children, as well as Rhonda Messler and Margo Thielen. Also my co-counsel Eric Stanley and Stephen O'Banner present. I'd like to focus on three reasons why this court should affirm the district court's injunction, preserving the status quo so that my clients will not be forced to choose between their deeply held religious beliefs and their livelihoods while they await trial. First, the trial court applied the correct legal standard by considering the substantial evidence that the regulation's object was to suppress religious objections. Second, the trial court's findings are amply supported by the record. And third, the injunction is inherently self-limiting and necessary to protect plaintiffs, as is pending trial. Just a minute. You asked the court to have a different type of injunction, didn't you? Initially, our proposed order was for the injunction to apply to the plaintiffs, yes. Yes. But we believe that the court made the right decision in applying it to all those who have religious objections that are similarly situated. All those who have religious objections who are similarly situated are not here. Only the plaintiffs brought this case. Plaintiffs brought this case suggesting that they have some standing and that they have the cases right, which, of course, has been disputed. And they have a case in front of us where they have particular concerns that would not address all of the state of Washington. Sorry, I'm throwing in Idaho now. Wishful thinking. Yeah, wishful thinking. Not address all the state of Washington. And the district court could very easily fashion injunction, something put forward by you, which would only handle the situation here because we're going to have a trial. This is a preliminary injunction. We only have three parties in front of us. The whole state of Washington is not up in arms. We got three parties here, and they filed a suit. Why can't we fashion an injunction, as you asked for, that would fashion this so that we can go on and wait? This seems to be a situation, in your argument and others that have been made here today, you're both on cause ideas. You're both supporting causes out there fighting dragons. We got a case in front of us. The court's not to be involved in trying to set policy in the state of Washington. We're supposed to do what we have to do to determine constitutionality under 1983. But until we get there, have what we got to do to keep the situation. If you can make your burden constant. I would respectfully submit that just because something is the easiest route doesn't mean it's the best route. Counsel, can I just add to it? I didn't come up with this idea, obviously, and I didn't hear it before we were sitting out here on the panel. But it's really not typical for a district court judge to grant relief greater than that which is requested. It's not typical and it's generally considered imprudent because as a district court, when you're considering the scope of an injunction, you're supposed to address the harms that are before you. And to reach out seems highly unusual and expansive, especially in light of the fact it wasn't requested. Your Honor, you would know more than I as to what is typical and not. But what I do know is that Judge Layton told the parties he spent over 600 hours reviewing the record and preparing his opinion. He gave it much consideration. We've spent a lot of time, too. I have to say, I don't know when the last time was. I had to carry around the briefs in huge boxes. I sort of wish I got paid by the word, actually. Natural Resources Defense Counsel, Inc. v. Winter, our own circuit says, injunctive relief must be tailored to remedy the specific harm alleged, and an overbroad preliminary injunction is an abuse of discretion. Now, when I read that case, I likened it to this. Now, you've already had one of my panels say that the burden of this particular injunction that, in fact, this panel, considering whether we ought to have an injunction before we got to us, said, hey, we find that the harm is most generally on you, your parties. And so they kept the injunction in place until they got to us. Now, I'm saying to myself, tell me why, given that standard, I should remedy all the harm in Washington. A hypothetical harm. Yeah. You don't know because there's no record. I would submit that the record is much more complete than what has been purported to this court. Well, you know, there's a lot of newspaper articles, and with all due respect, I purposefully did not read any newspaper articles on this or editorials or anything. Oh, they didn't spell your name wrong. They did? Well, now I'll have to read them. I mean, I just feel somewhat like Judge Smith that, you know, this thing is we've lost sight of what the real issues are. Now, I don't necessarily agree the district court applied the correct legal standard, but I also think that the record is full of, you know, hearsay and news articles and mischaracterizations. You go back and you read the underlying thing and surveys that I'm not sure are valid. And I just wonder, you know, if we had a true evidentiary record, whether even half of this would be admissible. I think that's why the standard of review is so important. What we would like to urge the court to do is to look at the official actions that the board took, and that includes the documents. There are many documents that were prepared by the board post-adoption of the regulations that barred conscience rights, and that was related to one of the questions that you raised earlier. And those documents expressly tell the public how those regulations will be interpreted and that pharmacies have absolutely no right of conscience at all. Well, let me stop you right there, because I don't find a right of conscience in the Constitution. We've made our way to the merits now. And the most, I guess, fundamental question I have for you is that as I read your briefs and the briefs submitted by parties aligning themselves with your clients, and as I read the district court order, the court seems to conflate religion and moral objections. Not all objections of conscience happen to be religiously based, and the First Amendment is limited to religion. So from the get-go, aren't we talking about something here that's overbroad? How can you justify overturning the regulation based on the First Amendment when, in fact, many of the objections, there's no sign of religion anyplace? I would say several things to that. First of all, the Supreme Court has been very careful not to distinguish between moral and religion. If you look at the military conscription cases, those cases are very clear that the court has not wanted to draw that line, probably for Establishment Clause purposes. I beg your pardon. I don't think the Supreme Court has opened the door to any kind of moral objection. Certainly, the Selective Service cases did not say any kind of objection is sufficient to justify conscientious objector status. They said the opposite. They said just the opposite. And if you look at the Lukumi case, which is the best that your side has to offer, that's tied very much to a specific religion. And the point of the court's decision was that this is an action aimed at seeking to adversely affect the adherence to that faith. And I look at your argument. It's much more athorphous. We're not talking about religion. I don't see religious words sprinkled through the briefs. I don't see religious justification offered in the district court. It's conscious. Well, conscience and religion are certainly overlapping, but I don't know that they're the same thing. And I need to find out from you why it is that we should accept this defense of conscience as something that's supported by the First Amendment. I think primarily that goes to the general applicability analysis because I think when you look at the exemptions that are provided in the regulations themselves, it demonstrates that this is not a case of personal, religious, and ethical or moral exemptions. I don't think you're answering Judge Clifton's question. I mean, for example, suppose we had an agnostic who disagreed politically with the FDA's approval of Plan B as a drug, and he happened to be a pharmacist. Would he be protected under your reading of this statute? I mean, under your reading of the First Amendment from refusing to prescribe Plan B to someone who walked in with a prescription? Or could the law be enforced against him because he's agnostic and has a political disagreement with the FDA, but not against someone who disagrees with it because they happen to be a Catholic? I believe that the court would need to go through the Lukumi analysis. And if it is a politically based objection, it would not meet the test under Lukumi. The key here is... So how can you strike down the whole statute? Because I'm sure there are people who exist in that category. Well, that's what happened in Lukumi. The court found that the law was not neutral and generally applicable as it applied to religiously motivated conduct, and the law was struck down. By a specific religion, which was targeted by the statute, Santeri. Which is exactly what occurred here. What is the specific religion that was targeted by the statute? It doesn't need to be a specific religion. It can be religion in general. What is the religion? A religious objection to Plan B was targeted. But that's not what all your briefs say. And you just said several times in the course of your oral argument that it was a conscience-driven objection. I started circling in your brief the number of times we had phrase religious or moral, or moral or religious. It didn't just say religion. And there's a good reason why it doesn't, because many of the objections are more generally moral-based. My concern is the First Amendment doesn't provide right to free exercise of personal morality. And I'm still not hearing an answer that tells me why this is something that's targeted against a religion, as opposed to against opposition to the regulation based on more general moral principles. If we go back and we look at the record, which is what this court, the standard of review would require this court to do, what was the record before the trial court at the time the trial court considered this matter, not based on the new briefs, what we see in those briefs, in the briefs as well as in the record, is that from the outset of this rulemaking process, the state said that the rules were sparked. They were begun by the fact that pharmacists had raised objections to emergency contraceptions on the basis of religion. And sometimes they swapped that word for conscience. This is actually what it says, and I'll read the front page of the order describing what your action seeks. They seek to enjoin the enforcement of regulations making it sanctionable for a pharmacy to permit a pharmacist employee to refuse to fill a lawful prescription because of religious or moral objections. And I see that phrase, religious or moral, constantly through the district court's decision and through your briefs. And I don't think there's a First Amendment right to moral objections. The First Amendment, free exercise of religion, is about religion. I need to figure out what it is about your case that justifies action based on the First Amendment if so much of the case and so much of the district court's order is based not simply on religious objections but on more general moral objections. Your Honor, I believe, perhaps incorrectly, both the counsel and Judge Layton were using the terms religion and moral interchangeably as well as conscience. That may be the case. But what I do know is that plaintiffs in this case have a religious objection. If that's true, that's pretty sloppy. It's pretty sloppy analysis to use those three terms when you're talking about the free exercise of religion clause, which has its own jurisprudence that we need to apply carefully and analytically. I would suggest that the military conscription cases give support for the fact that a court would, in fact, Justice Harlan's concurrence in, I believe it's the Welch case, talks about the fact that moral objections are based out of the First Amendment. And so I think there is some support to say that the court does not want to go into the judicial thicket of parsing between The cases have said is that the court doesn't really want to get into saying, is this a religious-based belief or some other based belief. The court doesn't want to have to do that on a case-by-case basis, which the court now in this case sort of has to do it because you've raised all three. Plaintiffs would submit that we have a religious objection. It's not a moral objection. These plaintiffs. These plaintiffs, yes. But we don't know about all the other pharmacies in the state of Washington. And this leads to the whole case because you're asking us to identify the object of the regulations. Well, looking at it, I'd say the object of the regulations, taking as you've characterized it, is to squelch opposition, but opposition's not necessarily religious. So I'm sitting here saying, well, can I infer, in the same way that in Lukumi, the Supreme Court infers hostility toward a particular faith, indeed discerns hostility toward not just religion in general, but toward this one group because they managed to carve out from the statute or from the ordinance a sacrifice for kosher purposes. Here you're giving us a much more general basis of objection, and accepting your characterization, the state's determined to squelch it. It'll let economic excuses stand, but these kind of morality conscious excuses can't stand. But if all the First Amendment protects is something more specifically religious, something more like Lukumi, then even as I go through the exercise that you're asking us to go through, I'm not sure I can discern from what the state has done hostility toward religion. I might be able to discern hostility toward objections based on conscious grounds, and religion's probably a part of that for many, perhaps most people. But it's something a little bit different. And so that's why, as I've spent perhaps not 600 hours, but some days it sure seems like it, a lot of hours with this case and with the briefs, this is a slippery thing to pick up. And I think if you're going to base the case on the First Amendment, we're going to need some strong connection to religion someplace. And I'm not sure that I see the hostility toward religion in what the state has done. Certainly nothing of the nature of Lukumi. Your Honor, I would respectfully submit that under the standard of review, you look at the record that was before the trial court, and unless this court has a definite and firm conviction that the trial court's findings are implausible in light of the entire record, then it should affirm. And in this case, the record is clear that at least religiously. I completely misstated the standard of review because if there's an error of law, we review that de novo. You're talking about factual findings. And factual findings we look at for clear error. But if there's errors of law, if the district court based its grant of the injunction on a wrong application, wrong view of the law, misapprehension of the law, then that can be reversed if we have a different view of the law. I understand that, Your Honor. And this court should review the legal standard in terms of a de novo. But factual findings are based on a clearly erroneous standard. I believe that it's clear that Judge Layton applied the correct legal standard in terms of applying Lukumi, including Justice Kennedy's decision under San Jose. I think that footnote stands for much more than what opposing counsel suggested. And in addition, it's not even clear that five justices rejected Justice Kennedy's decision. No, they clearly didn't. But I think two at least did. But another group didn't speak to it at all. They went off in an entirely different direction. Yes. And I think the American Center for Law and Justice amicus brief is very helpful on outlining other cases where the court has looked at that type of evidence. So in terms of the legal standard, I believe that it's clear Judge Layton understood the free exercise law, but the defendants, and perhaps this Court may disagree with how he applied that to the facts, how he saw it. And what he saw, based on what was in the record, was an overwhelming evidence that the State had targeted religiously motivated conduct. And while at some points in that decision he may have said religious or moral, he also said at points in that decision he just limited it to religious conduct. In terms of the overbreadth concern that this Court has, if this Court feels like it needs to narrow the injunctions to the plaintiffs, then we would obviously, that would be what the Court decides. But we don't feel that's necessary. Do you really think we have the power to do that? Or do we need to remand? I could not find a case, to be candid, where the Court did on its own limit the injunction. It's been a while since I've looked for that. What we do is we remand with instructions to the district court to limit it. I looked all over, and I couldn't find anywhere we would take the injunction and try to fashion it on this Court. Correct. The district court. Now, if we do that, the district court said, and I quote, the evidence for the court convinces the plaintiffs the individual pharmacist demonstrated both the likelihood of success and the possibility of irreparable injury. That's one end of the test. My end of the test, which I continue to suggest to you, is on the other end, where the stay applicant demonstrates that the balance of the hardships tips sharply in its favor. If I have an injunction that I'm applying to the whole state of Washington rather than to the individuals who are involved in this particular action, then I don't know whether I can get a sharply tipped balance. One may be able to suggest that their hardships are equal, and in fact, if you read our former colleague's interpretation, Judge Tashima seems to think that there is quite a balance for those who would be interveners here and not much of a balance for those who are the plaintiffs. And my other two colleagues said, no problem, injury for the plaintiffs. But now if we tip to the other side where we're only talking about a balance of hardship tips, then you only must show serious legal questions. So I'm suggesting to you, why wouldn't we then limit the injunction? I would suggest that your two colleagues got it right and respectfully suggest that Judge Tashima, while he made some important points in terms of what one would think the record might be, that's not actually what the State has proven in this case. What the State has proven is that they have not identified one single community in eastern Washington or otherwise that doesn't have access, readily available access. Judge Layton looked at the NARAL survey, which he took judicial notice of essentially in the motion to stay, and found 93 percent of all pharmacies stock Plan B throughout the State. Not even the interveners. If you look at their declarations as opposed to what their counsel has said in their briefs, not even the interveners were denied relief or denied Plan B in a timely manner. In fact, most haven't even ever needed it. So to argue that access to Plan B is going to somehow be jeopardized by this injunction, there's just no support in the record for that. And in addition to that, when we look at the exemptions, if the State was truly concerned about access to Plan B, then why doesn't it require other pharmacies to stock it? Why isn't there a mandatory stocking requirement? Because that would actually increase access more. And if you look at the Third Circuit's decision in Blackhawk, that court ---- Maybe it's because you're just assuming that was the whole design of the statute. Maybe that isn't the whole design of the statute. To increase access to Plan B. Maybe it's to increase access to timely medication generally. Well, the State, I wrote it down, they've said many times their interest is in increasing access to time-sensitive medications. And those can be identified. So for most time-sensitive ---- They're not limited to Plan B. No, no. If they're ---- I don't believe that their interest really was in a general interest because the record doesn't support that. But if we take them at their word and say it was broadly in time-sensitive medications, then why aren't they mandating that pharmacists stock that? Because what their own report shows is that 15 percent of pharmacies don't stock Plan B, for example, because of low demand. If they were really interested in access, then they would have required the mandatory stocking. The legislature can act in increments, and maybe that's their next step. Who knows? Well, that very well may be their next step. But for purposes of the preliminary injunction, we look at what they've done so far. Whether the exemptions that are currently in place in the regulations, which clearly do allow personal, subjective, unknown exemptions, even a mental objection. If a pharmacist believes that they don't have the particular skill or knowledge to fill a prescription, then they don't need to do that, which that can be remedied by training. So there are all kinds of exemptions that are found in this regulation, yet no religious exemption. And there's no mandatory stocking, which would further increase access. Are there other drugs to which there would be a religious objection? The only drugs that I know of that are involved in this case are Plan B, and that's what the injunction is limited to. So it doesn't stop access to any other medication. Wasn't there evidence in the record about HIV and syringes and other kinds of things? We mention in our brief that those references in the record, if you look at where they originated from, they originated from the Planned Parenthood organization, Northwest Women's Law Center, and the American Civil Liberties Union, and they were reported over and over again as hearsay second and third hand before the board. Five instances out of the 21,000 comments, and as the counsel already conceded before the trial court, 99% of those 21,000 comments focused only on Plan B. So to suggest that there was any substantial evidence or really even any minimal evidence that there is other objections that are nonreligious or other objections to other medications is just not supported by the record. And, again, as this Court seems inclined to do, if you're going to look at what the plaintiff's specific objections are, you would look at Plan B only. We believe that life-saving drugs should be given, not life-ending drugs. And what the government is forcing our clients to do is to choose between violating their consciences by terminating what they believe to be sacred life. And that goes to the very core of religious rights and who they are. So I would respectfully suggest that the balance does tip sharply in favor of the plaintiffs and those who are similarly situated, but at a minimum in the balance tips in favor of the plaintiffs. Thank you. Well, you've really taken up your time. I'll give you three minutes. Thank you very much. What we have here is a situation where the board adopted a rule that did not target any religion or any drug. The plaintiffs assert that they were targeted. They believe that they were targeted. But their belief is not the touchstone for analysis. The touchstone for analysis is the language of the rule itself, not the motivation that we don't know about from the board. The Supreme Court tells us to look to the object of the statute. Look to the object. You can tell by looking at the text and the operation based on the text. We're kind of kidding ourselves if we don't think we're talking about conscious here. Just like two generations ago it was about contraceptives, and God knows what will be two generations from now. But right now it's talking about morning-after type contraceptives. And to remove ourselves from that context, to pretend that all this is about something else and it's just happenstance that it crosses the path of Plan B is really to be fooling ourselves. You can offer that up as an argument if you want to, but that's why everybody is here. Everybody is here because of Plan B. But you can have a situation where a threat to public health, safety, welfare arises in a particular situation, even a situation that might involve religion, but the government chooses to address that harm in a manner that is neutral and generally applicable. Just because it arises in a context doesn't mean it's addressed. Has it chosen not to, in effect, squelch all objections? Only a certain kind of objection seems to be ruled out by this. For a pharmacist, there is no objection that is squelched. The rule does not require any pharmacist to dispense any drug over any objection. The burden is placed on pharmacies. Now, pharmacies in the state of Washington, to my knowledge, every single pharmacy in the state of Washington is a corporation. That raises a question that the district court did not decide, whether a corporation can have a free exercise right or not. But if we're talking about individual pharmacists here, the rule does not require any pharmacist to dispense Plan B. It places the burden of providing time-sensitive drugs on pharmacies. It's true. They can leave the business if they want to. But let's take a realistic experience. Pharmacies, as businesses, have an obligation to accommodate religious objections of employees. If a pharmacy has failed to do that, that's a different issue. That's not something that's mandated by these rules. You can make the arguments, but it seems to me in making these arguments you're avoiding the point. The point is that we're talking about an access to medicine, addressing a situation that arose in a particular circumstance, but not addressing it in the context of that particular circumstance. Counsel, it's of some concern to me that I've had one of my panels rule on whether we should have a continuing injunction pending getting to me. That was Nelson, Tashima, and Biden. And they ruled, using the standard which is there are serious questions, but the balance tips sharply in favor of the plaintiffs, that they should keep that injunction going. Now, that's a panel before me, and that was just to get to me. Now, what in their decision is wrong, given what I should do just to get this to the next hearing, especially given that I'm to take this, and they didn't have this as a concern, an abuse of discretion of the trial judge. Now, they, on totally giving no discretion to the trial judge, just looking at the standard itself, because they're just making the standard for what it's going to do to get to me, not looking at the abuse itself. Why should I undo, given that I've had this good panel, equal judges, all of them, longer on this court than me, some kid from Idaho who just barely got here. Why should I not stay right there with them, especially given an abuse of discretion standard? Your Honor, I don't disagree with that panel or with that decision. What I disagree with is the fact that there's a balance of harms that tips sharply in favor of the plaintiffs. They allege a series of harms that are not fairly traceable to the rules at issue here. That's why they have not shown harm. All right. Thank you, counsel. Thank you. I thank both counsels for their arguments today. They were very well done, and a very excellent airing of the arguments on both sides. So Stormins v. Selicki will be submitted, and this court will be adjourned for today. Thank you.
judges: Wardlaw, Clifton, Smith